# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### COLUMBIA DIVISION

|  |  |  |
|---|---|---|
| EDWARD L. CHEATHAM, LARRY GIST, WILLIAM HOLT, AND JAMES TEEPLES, ON BEHALF OF THEMSELVES AND ALL OTHER PERSONS SIMILARLY SITUATED, | ) ) ) ) |  |
|  | ) |  |
| Plaintiffs, | ) |  |
|  | ) |  |
| v. | ) | No. 1:11-00006 |
|  | ) | Judge Sharp |
| THE R.C.A. RUBBER COMPANY OF AMERICA, THE PULASKI RUBBER COMPANY, THE PULASKI RUBBER COMPANY BENEFIT PLAN, AND DOES 1 THROUGH 20, | ) ) ) ) ) |  |
|  | ) |  |
| Defendants. | ) |  |

## MEMORANDUM

This is a class action brought by former union employees and their spouses which arose after their health benefits were terminated. Pending before the Court is Plaintiffs' Motion for Summary Judgment (Docket No. 74); a Motion for Summary Judgment filed by Defendants Pulaski Rubber Company ("Pulaski"), and the Pulaski Rubber Company Benefit Plan ("the Plan") (Docket No. 70); and a Motion for Summary Judgment filed by the R.C.A. Rubber Company of North America ("RCA") (Docket No. 72). Those Motions have been exhaustively briefed by the parties (Docket Nos. 71, 75, 73, 85, 87, 89, 93, 94 & 95).

## I. FACTUAL BACKGROUND

Plaintiffs Edward L. Cheatham, Larry Gist, William Holt, and James Teeples bring this

1

action on behalf of themselves and other retirees who are former employees[1] of Pulaski and who were members of the bargaining unit represented by the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC ("USW"), or its predecessor union, the United Rubber Workers ("URW").[2] Each of the named Plaintiffs retired from Pulaski's employment between 1998 and 2001.

Defendant RCA manufactures rubber products for the transit industries, including flooring for municipal transit buses, school buses, and subway cars; step treads for ladders; and coverings for school bus steps. Throughout its existence, RCA has been largely family owned, with the majority of RCA shares owned by the Reiss family.[3]

Defendant Pulaski was the wholly-owned subsidiary of RCA. Located in Pulaski, Tennessee, it manufactured rubber products, until closing on October 1, 2005 pursuant to a Plant Closure and Termination Agreement (the "Termination Agreement").

Defendant Plan is an "employee benefit plan" and "employee welfare benefit plan" within the meaning of § 3(1) and (3) of the Employee Retirement Income Security Act, 29 U.S.C. §§ 1002(1) & (3). It was sponsored and funded by Pulaski.

Initially, Pulaski made bicycle tires for Murray Ohio Manufacturing Company ("Murray") and, in fact, came into existence after Murray closed its Ohio operations and moved to Tennessee in the mid-1950s. Thereafter, Pulaski manufactured tires for toys and farm implements and, starting

---

[1] The spouses of those employees are also members of this class action.

[2] The URW merged into the USW in 1995. Prior to the merger, Pulaski negotiated CBAs with the URW and URW Local No. 681, and, after the merger, with the USW and USW Local No. 641.

[3] These family members are related to C.E. Reiss, Sr., now deceased, who was one of the founders of RCA.

in the late 1970s, began manufacturing products for the transit industry. In fact, for at least the last five years of its existence, Pulaski made only transit-related products, focusing on flooring and step treads for school buses.

Through 2000, Pulaski was self-sufficient and profitable. However, in 2001, RCA's unionized work force in Akron, Ohio went on strike for a three-to-four month period which meant that Pulaski was unable to obtain raw materials and fulfill orders. As a result, Pulaski lost business and looked to RCA for credit. It never fully recovered from the strike and, by the time it closed in 2005, Pulaski owed RCA more than $1.5 million for raw materials, payroll, and fixed costs.[4]

During all relevant periods, the union workforce was covered by Collective Bargaining Agreements ("CBAs"), negotiated between the USW and Pulaski. Health insurance benefits for active and retired Pulaski union employees were provided pursuant to insurance agreements, documents that the USW and Pulaski negotiated simultaneously with, and separately from, the CBAs.[5]

The insurance agreements remained in effect between 1985 and the 2005 shutdown. In 1985, the parties entered into a group insurance agreement which included retiree (and surviving spouse) health provisions and had an expiration date of September 13, 1987. That agreement indicated that employees "who have retired on a monthly benefit payment under our pension program or employees who will retire on a monthly benefit under our program during the term of this agreement shall receive the benefits as set forth" in the agreement. (Docket No. 67-14 at 12 ¶ O). In the

---

[4] From approximately 2000 to the plant shutdown, Pulaski went from having a net worth of $2.5 million, to a $2 million deficit.

[5] From 1969 to 2002, twelve to fifteen CBAs and agreements were negotiated between the URW/USW and Pulaski, some of which were "me too" agreements, meaning that they were similar to agreements negotiated for other rubber manufacturing facilities.

following paragraph, the agreement contained virtually identical language indicating that surviving spouses, too, "shall receive the benefit." (Id. ¶ P).

In 1987, the parties entered into another group insurance agreement, effective September 13, 1987 to September 10, 1989, which did not change the "shall receive the benefits language," or the durational provisions for active employees' insurance. In 1989, the union and Pulaski entered into a "First Amendment to the Pulaski Group Insurance Agreement" ("First Amendment"), in which they: (1) agreed that the 1987 Insurance Agreement expired on its own terms on September 10, 1989; and (2) defined the 1987 Insurance Agreement as the insurance document to be renewed and continue with certain changes; and (3) provided that "[i]n all other respects, the [1987 Insurance] Agreement is adopted and incorporated in this First Amendment without change." (Docket No. 77-1 at 41). Thereafter, in successive Amendments Two through Six to the 1987 Insurance Agreement, the parties continued to reference the 1987 Insurance Agreement; agreed to renew the terms of the 1987 Insurance Agreement, as previously amended and with any changes stated in the Amendments; agreed to a new effective date (recited in each successive amendment); and agreed to an end date. Each of these Amendments Two through Six concluded with identical language stating: "in all other respects, the amended Agreement [i.e., the 1987 Insurance Agreement, as modified by all subsequent prior amendments] is adopted and incorporated into this [current Amendment] without change." (Id. at 46, 49, 51, 53 & 55).

The various amendments to the Insurance Agreement changed (among other things) the deductibles and co-pay for benefits.[6] Further, the Group Benefit Plan Booklets and SPD Summary

---

[6] Retirees received the same coverages and had the same deductibles and co-payments as active employees, but the retirees did not enjoy prescription drug benefits.

Plan Descriptions ("SPDs") provided to employees indicated that the plan sponsor could modify or amend the Plan from time to time at its sole discretion.[7]

Plaintiffs insist that the 1987 Insurance Agreements obligate Pulaski to provide continuing retiree health benefits. Specifically, Plaintiffs point to the following language contained in the 1987 Agreement which mirrors that found in the 1985 Agreement:

> Employees <u>who have retired on a monthly benefit payment under our pension program</u> or employees who will retire on a monthly benefit payment under our pension program during the term of this agreement **shall receive the benefits** as set forth in Paragraphs E, F, G, H, and I [substantive insurance benefits] of this section. This includes dependent coverage for those dependents such retired employee had or has at the time of retirement. It will not cover dependents acquired after such retirement.
>
>             *                   *                  *
>
> The surviving spouse of an Employee who <u>has retired on a monthly benefit payment under our pension program</u> or will retire on a monthly payment under our pension program during the term of this agreement **shall receive the benefits** as set forth in Paragraphs E, F, G, H, and I [substantive insurance benefits] of this section, and the spouse who was covered by these benefits as an eligible dependent shall continue to be eligible to receive such benefits **to the earlier of the date of death or remarriage**.
>
>             *                   *                  *
>
> The surviving spouse and eligible dependents of an Employee whose death occurs at a time such Employee has, attained age 55 or more, and had accrued ten (10) or more years of credited service, as of his last day worked, will continue to be eligible to receive the benefits provided in Paragraphs E, F, G, H, and I [substantive insurance benefits] of this section **until the earlier of the date of death or remarriage of the surviving spouse, or until such time said spouse is employed by any employer who provides, other non-contributory insurance**.

(Docket No. 77-1 at 15-16, ¶¶ O & P, bold and underlining supplied by Plaintiffs).

Plaintiffs also claim that the 1987 Insurance Agreement set conditions for termination or

---

[7] Such provisions were contained in at least the 1998 and 2004 SPDs.

suspension of benefits for active employees that did not apply to retirees. Specifically, Plaintiffs point to the following language:

> Except as described in the "Layoff" and "Leave or Absence" provisions . . . all insurance . . . will terminate when employment with the Company terminates except as follows: (a) The Hospital, Surgical and Hospital-Medical Expense Benefits for an Employee or dependent will be extended for three months following such termination…. (b).Coverage . . . will be extended for three months for the spouse and dependent children of an Employee who dies while in the payroll of the Employer, while on Sick Leave . . . during [an] authorized leave of absence for a period not to exceed 90 days, or while on authorized Leave of Absence for service with a Local Union in an official or representative capacity.

(Id. at 3-4, ¶ D).

Defendants do not dispute that the foregoing provisions appeared in the 1987 Insurance Agreement. They do insist, however, that the language does not impose any obligation on Pulaski to provide retiree health benefits beyond the terms of the agreement, that the benefits changed over the years, that the conditions relating to termination and suspension of benefits was inoperative in 2005 in light of the Consolidated Omnibus Budget Reform Act ("COBRA"), and that the Termination Agreement negotiated between the USW and Pulaski terminated the Insurance Agreement and all retiree health provisions under the Insurance Agreement.

Pulaski and the USW negotiated the Termination Agreement in the summer of 2005. The cover of the Termination Agreement contains the following paragraph:

> WHETHER OR NOT THIS OFFER IS RATIFIED BY THE AUGUST 16, 2005 DEADLINE, ALL EMPLOYEES WILL BE TERMINATED DUE TO THE COMPLETE PLANT CLOSURE ON OR BEFORE SEPTEMBER 30, 2005. ACCORDINGLY, ALL MEDICAL INSURANCE BENEFITS FOR ACTIVE EMPLOYEES WILL CEASE AS OF 12:01 A.M. ON OCTOBER 1, 2005.

(Docket No. 68-4 at 1). Section 13 states:

> Except to the extent superseded by the terms of this Agreement, the current Collective Bargaining Agreement shall remain in effect until the last bargaining unit

employee is released.  It is understood and agreed that this Plant Closure and Termination Agreement sets forth the entire agreement between the parties hereto and the employees represented by the Union who are terminated pursuant to this Agreement and that all claims, rights and obligations of such employees arising out of the employment relationship and/or the Collective Bargaining Agreement are, along with said Collective Bargaining Agreement, merged into and fully set forth in this Agreement.  It is further agreed that upon the release of the last bargaining unit employee which will signify the permanent cessation of the manufacturing operations at the Pulaski, Tennessee facility, this Plant Closure and Termination Agreement shall be the sole agreement between the Parties and the collective bargaining relationship, the Collective Bargaining Agreement and the Group Insurance Agreement shall then terminate.

(Id. at 7).

The Termination Agreement indicated that Pulaski and the USW "are parties to a Collective Bargaining Agreement and a Group Insurance Agreement each effective September 2, 2002 through September 10, 2006."  (Docket No. 77-3 at 2).  The Termination Agreement provided expedited lump sum pension benefits to all employees who were terminated under its terms,[8] and employees who accepted the benefits were required to sign releases in which they agreed "to release, waive and discharge the Company and the Union, their successors and assigns, from any and all rights, liabilities, claims, demands, damages and causes of action, known or unknown, arising out of the termination of my employment relation hereby effected."  (Docket No. 77-3 at 14).  Additionally, Pulaski's terminated employees were provided COBRA coverage by RCA.

The USW consented to all the provisions of the Termination Agreement.  However, Pulaski management refused to negotiate retiree medical benefits with the USW, believing (1) it was not legally obligated to negotiate on the continuation of retiree medical benefits, and (2) the USW did not represent retirees.

_____

[8] As part of the Termination Agreement, the RCA Pension Plan and the Pulaski Pension Plan were merged in order to provide adequate funding for severance benefits to Pulaski's active employees.

RCA, as the sole shareholder of Pulaski, made the decision to close the Pulaski facility and wind down Pulaski's corporate affairs. Following the shutdown, most of Pulaski's manufacturing equipment was sold at auction, and the facility was sold for $350,000. Pulaski only exists as a corporate entity today in order to reduce tax liability on the income from the sale of the Pulaski facility.

After Pulaski closed in 2005, and for the next five years, RCA provided funds on behalf of Pulaski to the third-party administrator for the payment of retiree medical claims. Retiree's medical claims were paid until November 1, 2010.

In a letter to retirees dated August 16, 2010, RCA President and Chief Executive Officer Sherry D. Price, informed Retirees that retiree health benefits would no longer be provided, writing:

> Although the Pulaski Rubber Company ("Company") has had no obligation to continue to provide medical insurance once the insurance agreement terminated, the Company tried to maintain this insurance for its retirees. However, due to current economic conditions and forecasts, we regret we must inform you that effective November 1, 2010, we can no longer provide medical insurance benefits to retirees and their dependents from the Pulaski Rubber Company.

(Docket No. 1-3 at 1).[9] She also informed the retirees that they could elect to make COBRA payments to continue their medical coverage for the next eighteen months. In accordance with the letter, Defendants ceased providing benefits to Retirees after October 31, 2010.

On January 27, 2011, Plaintiffs filed a three-count Complaint in this Court, seeking a declaration of their rights to retiree health benefits and damages to remedy the reduction in benefits. They allege in Count I that, because the rights medical benefits for retirees and their spouses were

---

[9] In early 2007, Rick Reiss, then-president of both Pulaski and RCA, was advised by counsel that, under the Termination Agreement, RCA had no legal obligation to pay for retiree health benefits. A letter dated January 29, 2007, was drafted for the purpose of notifying Pulaski retirees and their dependents of the discontinuation of medical insurance benefits, but the letter was never sent after Reiss's contract was not renewed a month later.

created through agreements between a labor organization and Pulaski, Defendant RCA's and Pulaski's failure to abide by those agreements violates Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a). In Count II, Plaintiffs bring claims against all Defendants under §§ 502(a)(1)(B) and (a)(3) of ERISA, 29 U.S.C. § 1132(a)(1)(B) and (a)(3), alleging that their rights to retiree health care benefits provided under the agreements have vested and the Plan cannot be unilaterally modified or terminated by Defendants. In Count III, which is pled in the alternative, Plaintiffs contend that Defendants' failure to abide by the agreements and provide retiree health benefits is a breach of fiduciary duty under ERISA.[10]

## II. <u>STANDARD OF REVIEW</u>

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. <u>See</u> Fed. R. Civ. P. 56(c); <u>Covington v. Knox County School Sys.</u>, 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. <u>See</u> <u>Martin v. Kelley</u>, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. <u>See</u> <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 248 (1986); <u>Covington</u>, 205 F.3d at 914 (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The

---

[10] In response to Pulaski's and the Plan's Motion for Summary Judgment, Plaintiffs do not oppose dismissal of their claim against those Defendants for breach of fiduciary duty. Plaintiffs have clarified that the breach of fiduciary duty claim is an alternative theory for imposing liability on RCA. (Docket No. 85 at 20).

nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. <u>Celotex</u>, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

### III. <u>APPLICATION OF LAW</u>

The parties have filed what are effectively cross-motions for summary judgment.[11] Stripped to its essence, two overriding questions are presented by the motions: (1) whether Plaintiffs are entitled to lifetime health benefits in accordance with the parties' agreement(s) and/or understanding; and, (2) assuming the first issue is answered in the affirmative, whether RCA is obligated to pay for those benefits now that Pulaski is no longer in operation. The Court considers those issues under separate headings.

### A. <u>Plaintiffs' Entitlement to Lifetime Health Benefits</u>

"Retiree healthcare benefit plans are welfare benefit plans under ERISA, but, unlike pension plans, are not subject to mandatory vesting requirements." <u>Bender v. Newell Window Furnishings, Inc.</u>, ___ F.3d ___, ___, 2012 WL 1537916 t *4 (6th Cir. May 3, 2012) (citing, <u>Maurer v. Joy Tech., Inc.</u>, 212 F.3d 917, 914 (6th Cir. 2000)). "If the parties intend for welfare benefits to vest and the agreement to that effect is breached, there is an ERISA violation as well as an LMRA violation."

---

[11] "The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation." <u>Ferro Corp. v. Cookson Group, PLC</u>, 585 F.3d 946, 949 (6th Cir. 2009).

Id.

In <u>Noe v. PolyOne Corp.</u>, 520 F.3d 849 (6th Cir. 2008), the Sixth Circuit summarized the applicable law for determining whether retiree health benefits have vested. There, the court wrote:

> . . . Retiree health benefit plans, such as those involved here, are welfare benefit plans; thus, vesting only occurs if the parties so intended when they executed the applicable labor agreements. <u>Id</u>. A court may find vested rights "under a CBA even if the intent to vest has not been explicitly set out in the agreement." <u>Id</u>. at 915. If the rights to health coverage have vested, then the unilateral termination of the coverage violates § 301 of the LMRA. <u>Yolton [v. El Paso Tenn. Pipeline Co.</u>], 435 F.3d at 578. On the other hand, an employer is free to terminate any unvested welfare benefits upon the expiration of the relevant CBA. <u>Id</u>.
>
> The seminal case for determining whether the parties to a CBA intended benefits to vest is <u>UAW v. Yard-Man</u>, 716 F.2d 1476, 1479 (6th Cir. 1983). Under <u>Yard-Man</u>, basic rules of contract interpretation apply, meaning that courts must first examine the CBA language for clear manifestations of an intent to vest. . Furthermore, each provision of the CBA is to be construed consistently with the entire CBA and "the relative positions and purposes of the parties." <u>Id</u>. The terms of the CBA should be interpreted so as to avoid illusory promises and superfluous provisions. <u>Id</u>. at 1480. Our decision in <u>Yard-Man</u> also explained that "retiree benefits are in a sense 'status' benefits which, as such, carry with them an inference ... that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree." <u>Id</u>. at 1482. With regard to the " <u>Yard-Man</u> inference," later decisions of this court have clarified that <u>Yard-Man</u> does not create a legal presumption that retiree benefits are interminable. <u>Yolton</u>, 435 F.3d at 579. Rather, <u>Yard-Man</u> is properly understood as creating an inference only if the context and other available evidence indicate an intent to vest. <u>Id</u>.
>
> When an ambiguity exists in the provisions of the CBA, then resort to extrinsic evidence may be had to ascertain whether the parties intended for the benefits to vest. <u>Int'l Union, United Auto. Aerospace & Agric. Implement Workers of Am. v. BVR Liquidating, Inc.</u>, 190 F.3d 768, 774 (6th Cir. 1999). If an examination of the available extrinsic evidence fails to conclusively resolve the issue and a question of intent remains, then summary judgment is improper. <u>Int'l Union, United Mine Workers of Am. v. Apogee Coal Co.</u>, 330 F.3d 740, 744 (6th Cir. 2003).

Id. at 352.

With this backdrop, the Sixth Circuit in <u>Noe</u> found that an employer's unilateral changes to retiree health benefits violated the governing CBA, as well as the LMRA. That conclusion was

supported by the fact that (1) there was no language in the agreement between the parties specifically stating that retiree health benefits would expire upon termination of the agreement; (2) language in the agreement tied eligibility for retiree health benefits to eligibility for a pension; and (3) the agreement indicated that the company would provide a Medicare supplement to surviving spouses until he or she remarried or died.  Id. at 554-64.

Noe is among the latest in a string of cases in which the Sixth Circuit has found that the parties intended (or likely intended) that retirees be provided lifetime medical benefits pursuant to a CBA or insurance agreement.  A brief summary of some of those cases is warranted because they fully support the conclusion that the retirees and the surviving spouses in this case have vested rights to healthcare insurance.

In Yard-Man, which set forth the analytical framework for such claims, the Sixth Circuit found the "key provision," to wit, that "the Company will provide insurance benefits equal to the active group benefits . . . for the former employee and his spouse" was ambiguous because, it "could reasonably be construed, if read in isolation, as either solely a reference to the nature of retiree benefits or as an incorporation of some durational limitations as well."   Yard-Man, 716 F.2d at 1480.  Nevertheless, the court concluded that the company and the union intended to create vested insurance benefits for retirees because: (1) the termination of insurance benefits for active employees – but not retirees – was "explicitly and clearly set out"; (2) the agreement indicated that when the retiree died, health coverage for spouses and dependants would expire with the expiration of the then applicable CBA; (3) early retirees were entitled to health benefits upon reaching 65 if they paid the cost of company insurance until that age, a promise which would be illusory for employees who retired under the age of 62 since the CBA lasted only three years; (4) the agreement contained

"specific durational limitations in other provisions" of the CBA, but not in the retiree health benefits provisions; and (5) "when the parties contract for benefits which accrue upon achievement of retiree status, there is an inference that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree." Id. at 1481-82.[12]

Relying explicitly on Yard-Man, the Sixth Circuit in Golden v. Kelsey-Hayes Co., 73 F.3d 648 (6th Cir. 1996) upheld a district court's grant of a preliminary injunction, and its finding that the plaintiffs were likely to prove they "ha[d] a 'vested' right" to retirement health benefits. Id. at 653. Factors which supported that conclusion included: (1) language in the CBA which linked eligibility for retiree and survivor health benefits to eligibility for vested pensions benefits and, since "retirees are eligible to receive pension benefits for life, . . . the parties intend that the company provide lifetime health benefits as well"; (2) language from the SPDs which indicated that the company guaranteed health benefits; and (3) the company's agreement to fund health benefits for employees who had already retired when the company was sold. Id. at 656-57.

Yolton involved another grant of a preliminary injunction. In affirming the district court's conclusion that the retirees were likely to succeed on the merit of their claim that they were entitled to fully funded lifetime healthcare benefits, the Sixth Circuit observed that, as in Kelsey-Hayes, the relevant agreement tied health insurance benefits to the pension plan, and this remained so notwithstanding the fact that the CBA contained general durational language because such language only affected future retirees. Id. 435 F.3d at 581-583. Further, and as in Kelsey-Hayes, the

_____

[12] This last factor has been dubbed the "Yard-Man inference," and it is just that – an inference, not a presumption. "Under Yard-Man, [a court] may *infer* an intent to vest from the context and already sufficient evidence of such intent," and the Sixth Circuit has "never inferred an intent to vest benefits in the absence of either explicit contractual language or extrinsic evidence indicating such an intent." Yolton, 435 F.3d at 580 (italics in original). "Rather, the inference functions more to provide a contextual understanding about the nature of labor-management negotiations over retirement benefits." Id.

company's "'conduct also indicate[d] that plaintiff's benefits were vested," id. at 583 (citation omitted), because various oral and written representations were made to retirees that their medical insurance benefits would continue for their lifetime.

The foregoing precedent leads this Court to conclude that the Pulaski retirees and their surviving spouses are entitled to continued lifetime healthcare benefits. Several factors lead to that conclusion.

First, the retiree health benefits are tied to the receipt of pension benefits. Specifically, Paragraph O of the 1987 Insurance Agreement (an agreement that was renewed six times, to and including September 10, 2006) provided that "[e]mployees who have retired on a monthly benefit payment under our pension program or employees who will retire on a monthly benefit payment under our pension program during the term of this agreement shall receive the benefits[.]" (Docket No. 77-1 at 15 ¶ O).[13] The agreement similarly mandated that "[t]he surviving spouse of an Employee who has retired on a monthly benefit payment under our pension program or will retire on a monthly payment under our pension program during the term of this agreement shall receive the benefits[.]" (Id. at 16 ¶ P). (emphasis added). As stated in Kelsey-Hayes, 73 F.3d at 580, and subsequently confirmed in both Yolton, 435 F.3d at 580, and Noe, 520 F.3d at 558, tying eligibility for retiree benefits to eligibility for pension benefits indicates an intent to vest. In fact, such linkage leaves "little room for debate that the retirees' health benefits vested upon retirement." McCoy v. Meridian Automotive Sys., Inc., 390 F.3d 417, 422 (6th Cir. 2004) (affirming injunction restraining company from terminating medical benefits of retirees and their spouses).

---

[13] The benefits identified include hospital expense benefits; diagnostic, x-ray, and laboratory test benefits; x-ray and radium therapy treatment benefits; surgical benefits; and hospital medical benefits.

Second, and building on the last point, the 1987 Insurance Agreement provides that when a retiree dies, "[t]he surviving spouse of an Employee who has retired on a monthly benefit payment under our pension program . . . shall continue to be eligible to receive such benefit to the earlier of the date of death or remarriage." (Docket No. 77-1 at 15 ¶ P). That language, like the similar language in Noe, suggests an intent to vest, otherwise the provision would "say that the spouse of a deceased retiree 'shall continue to be eligible to receive such benefits to the earlier of the date of death or remarriage, *or the expiration of this agreement.*'" Noe, 520 F.3d at 562 (italics in original). Without inclusion of such italicized language, "holding that Plaintiffs' health benefits have not vested would render [the] promise of health benefits until death or remarriage illusory for the spouses of deceased retirees in violation of precedent." Id.

Third, the 1987 Insurance Agreement includes a number of specific durational limitations for benefits other than retiree health care, and those durational limitations were carried forward in the renewals and amendments to that agreement. By way of example: most hospital, surgical, medical and sickness benefits for active employees terminated with the end of employment or three months thereafter (Docket No. 77-1 at 3); such benefits for surviving spouses and dependents terminated three months after the death of an active employee (id. at 3-4); benefits for illness or injury not covered by worker's compensation lasted for no more than 52 weeks (id. at 12); and group life insurance and non-occupational accidental death and dismemberment benefits generally ended on the date of termination of employment or on retirement (id. at 19). Under Yard Man, Yolton, and Noe, the presence of specific durational language in some provisions, and its absence in the retiree health benefits provisions, suggests an intent to vest. Noe, 520 F.3d at 562-63; Yolton, 453 F.3d at 582; Yard-Man, 716 F.2d at 1481-82.

Fourth, the company's treatment of the benefits suggests a continued entitlement. More specifically, and similar to the situation in <u>Kelsey-Hayes</u>, the health benefits for retirees was funded, even after the plant closed, albeit by RCA and not the now-defunct Pulaski.

Fifth, and in accordance with all of the foregoing, the Pulaski retirees are entitled to the <u>Yard-Man</u> inference. Given the context in which labor negotiations occur, it is almost axiomatic that employees who forego wages now for the promise of retiree benefits in the future, do so with the expectation that those benefits will continue through retirement. "That is, because retirement health care benefits are not mandatory or required to be included in an agreement, and because they are 'typically understood as a form of delayed compensation or reward for past services' it is unlikely that they would be 'left to the contingencies of future negotiations.'" <u>Yolton</u>, 435 F.3d at 580 (quoting, <u>Yard–Man</u>, 716 F.2d at 1481–82).

Without acknowledging any of the foregoing cases in the memorandum in support of their Motion for Summary Judgment, Pulaski and the Plan raise several arguments which they claim show that the retirement health benefits at issue were not vested. None of those arguments is persuasive.[14]

Pulaski and the Plan argue that the retiree health benefits did not vest because the agreements which created them had express termination provisions, such as the 1985 agreement which provided that would continue in force until September 13, 1987. As cases such as <u>Noe</u> and <u>Yolton</u> make clear, a general durational clause which provides that an agreement will remain in effect until a

---

[14] In addition to the following arguments, Pulaski and the Plan point to deposition testimony for their position that the parties did not intend for the retiree healthcare benefits to vest. Although Plaintiffs dispute Pulaski's and the Plan's characterization of the union's purported understanding, in light of the clear language in the Insurance Agreements of 1985 and 1987, the Court need not consider the extrinsic evidence proffered by Pulaski and the Plan. <u>See</u>, <u>Noe</u>, 520 F.3d at 563 n.4 ("Given our conclusion that the plain language of the EBAs indicates an intent to vest retiree health benefits, the consideration of extrinsic evidence is unnecessary").

certain date does not demonstrate that retiree benefits will terminate on that date. See, Noe, 520 F.3d at 558 ("As this court has held time and time again when confronted with similar provisions, general durational clauses of the sort found in the EBAs do not resolve the vesting issue, and it is necessary to determine if any provisions in the agreements shed light on whether the parties intended for Plaintiffs' health benefits to vest"). In fact, just this month, the Sixth Circuit confirmed Noe's language (which was drawn from Yolton) that "'[a]bsent specific durational language referring to retiree benefits themselves, courts have held that the general durational language says nothing about those retiree benefits.'" Bender, ___ F.3d at ___, 2012 WL 1537916 at *7 (quoting, Noe, 520 F.3d at 554).[15]

Pulaski and the Plan also argue that "[a]ll health benefits under the Insurance Agreement terminated as a result of the Termination Agreement," and that the USW never negotiated in the Termination Agreement for a continuation of retiree medical benefits. (Docket No. 71 at 8). The Court does not read the Termination Agreement as covering retiree benefits, and the fact that the union was thwarted in its efforts to negotiate about the insurance agreements does not establish that the retiree benefits contained therein were not vested.

In support of their position, Pulaski and the Plan quote the following language from Paragraph 13 of the Termination Agreement:

It is further agreed that upon the release of the last bargaining unit employee which

___

[15] In their response to Plaintiffs' motion and in their reply brief, Pulaski and the Plan claim that because the Insurance Agreement and the SPD contained a coordination of benefits agreement, this weighs against a finding that the benefits vested. However, the coordination of benefits provision merely provides that the company could retain an insurance company to pay the benefits described in the agreement, and that, if the company did so, it would be relieved of individual liability for payment. (Docket No. 67-14 at 16). This provision does not absolve Pulaski of liability for retiree healthcare benefits, particularly since, in that same paragraph, Pulaski agreed that it "shall be liable for benefits described in this Insurance Plan which are not provided in said insurance contracts." Id.

will signify the permanent cessation of the manufacturing operations at the Pulaski, Tennessee facility, **this Plant Closure and Termination Agreement shall be the sole agreement between the Parties** and the collective bargaining relationship, the Collective Bargaining **Agreement and the Group Insurance Agreement shall then terminate**.

(Docket No. 77-3 at 6 ¶13, emphasis supplied by Pulaski).   This language, however, is immediately preceded by the following:

> Except to the extent superseded by the terms of this Agreement, the current Collective Bargaining Agreement shall remain in effect until the last bargaining unit employee is released.   It is understood and agreed that this Plant Closure and Termination Agreement **sets forth the entire agreement between the parties hereto and the employees represented by the Union who are terminated pursuant to this Agreement** and that all claims, rights and obligations of such employees arising out of the employment relationship and/or the Collective Bargaining Agreement are, along with said Collective Bargaining Agreement, merged into and fully set forth in this Agreement.

(Id., emphasis added).  Read in its entirety, Paragraph 13 shows that the agreement related to the rights of active employees affected by the shutdown agreement, not retirees, a reading which is confirmed by other language in the Termination Agreement and conduct of the parties after the closure.

The cover sheet to the Termination Agreement speaks about employees being terminated on or before September 30, 2005, and states that "medical insurance benefits for active employees will cease as of October 1, 2005," (Docket No. 77-3 at 2) – it does not speak about retiree health benefits. Moreover, the active employees were required to sign releases, releases which did not mention retiree benefits and were not signed by retirees.  Further retiree medical benefits continued for many years after the closure, something which most likely would not have occurred were it intended that the Termination Agreement ended the right of the retirees to receive those benefits.

The fact that Pulaski refused to negotiate about retiree health benefits, does not mean that

those benefits were not vested.  Pulaski and the Plan cite Cunningham v. Osram Sylvania, Inc., 221 Fed. Appx. 420 (6th Cir. 2007) for the proposition that where "a union's proposal to continue retiree health benefits was rejected by the employer, . . . the retiree health benefits did not vest." (Docket No. 71 at 12-13).  Contrary to Pulaski's and the Plan's contention, Cunningham did not present "similar circumstances" as those presented here because, in that case, "[n]one of the provisions regarding medical insurance benefits for retirees included language that could be interpreted to vest those benefits for life." Id. at 422.    Rather, during negotiations which led to the agreements in Cunningham, the union sought to include language calling for vested benefits, something which the company rejected and the union subsequently withdrew.

Pulaski and the Plan additionally argue that, because retiree health benefits were in "lockstep" with the health benefits for active employees and the USW negotiated increasing co-payments and deductibles over in some of the six amendments to the 1985 insurance agreements, this is "evidence[] that health benefits under the terms of the Insurance Agreement never vested for Pulaski retirees." (Docket No. 71 at 13).  In response, Plaintiffs argue that the increases were not negotiated but were unilaterally imposed by Pulaski, and, in any event, were *de minimus*.

Regardless, of whether Pulaski unilaterally imposed the increase, and regardless of whether the increases were *de minimus*, Defendants have pointed to no evidence which remotely suggest that the Retirees conceded to the union the power to give up their health benefits.  "If benefits have vested, then retirees must agree before the benefits can be modified, even by a subsequent CBA between the employer and active employees." Maurer, at 918.  Further, "merely because plaintiffs chose not to bring suit on earlier changes does not mean that they have tacitly admitted that their benefits are limited and terminable." Hinckley v. Kelsey-Hayes Co., 866 F. Supp. 1034, 1042 (E.D.

Mich. 1994). "Instead, it merely indicates that the substance of the more recent changes have prompted them to seek relief." Id.; see also, Moore v. Rohm & Haas, 2008 WL 4449407 at * 11 n.35 (N.D. Ohio, Sept. 30, 2008) ("even if retirees tolerated modifications to health benefits in the past, they are not barred from now claiming that those benefits are vested").

Pulaski and the Plan also contend that because the 1998 and 2004 SPDs contained reservation of rights clauses that allowed the sponsor to modify or amend the Plan in its discretion, Plaintiffs have waived their claim to vested benefits by failing to grieve those clauses. Pulaski and the Plan also assert that, in light of the reservation of rights in the 1998 and 2004 SPDs, Plaintiffs' action is untimely because it was filed more than six years[16] after the effects of the SPD were known.

In support its position, Pulaski relies upon Winnett v. Caterpillar, Inc., 609 F.3d 404 (6th Cir. 2009), a case involving retirees' claims that Caterpillar breached its promise to provide "lifetime cost-free retiree health care." Even though the challenged benefit caps in Winnett did not become operative until 2004, the Sixth Circuit found that the claims accrued by 1998 or 1999, when the retirees received notices, "especially the notice provided by the SPD," that provided "clear repudiation" of plaintiffs' right to cost-free retiree health care. In fact, "[i]n 1998 and 1999, there was nothing contingent about Caterpillar's decision not to apply the 1998 CBA," and, "[b]ecause the accrual of a cause of action . . . turns on *notice* of the legal changes to a plan, not the later effects of those changes, the retirees could have challenged the changes in 1998." Id. at 413 (italics in original). In arriving at its conclusion, the Sixth Circuit observed that "a would-be litigant cannot postpone the accrual of a cause of action by claiming that, even though the company gave notice of

_____

[16] Because Congress did not provide a statute of litigations for claims under § 301 of the LMRA or § 502 of ERISA, Tennessee's six years state of limitations for breach-of-contract claims governs such claims. Central States Southeast & Sw. Areas Pension Fund v. Kraftco CO., 799 F.3d 1098, 1107 (6th Cir. 1986).

a change in benefits in year one, the change did not affect the litigant's health or pocketbook until year four." The court then wrote:

> If a company announces the removal of, say, a dental-care benefit, the claim accrues on the date of the company's announcement and notice, not the first day the affected individual needs dental work. Were it otherwise, the limitations period would start at a different point for every employee or retiree, even though they all work (or worked) for the same company and even though they all face the same change in benefits.

Id. at 410.

Winnett "involved a 'clear repudiation' of the promise of vested health insurance benefits where the SPDs spelled out that specific benefit changes would apply to existing retirees and would result in a cap on the employer's contributions; there were immediate benefit changes; it was expected that the [benefit] trust funds would be exhausted; and the reservation-of-rights language was sufficiently unqualified so as to trigger an obligation by the union to object." Bender, ___ F.3d at ___, 2012 WL 1537916 at *17. Here, in contrast, the 1998 and 2004 SPDs' reservation of rights clauses only advised retirees who received the booklets of the theoretical possibility that the plan might be changed; it certainly did not clearly repudiate the promise of lifetime benefits. See, Id. at **10 & 17 (district court did not err in finding no clear repudiation of retiree health benefits where SPD stated that, "[a]lthough the Company expects to continue the Plan in its present form, the Company may amend the Plan from time to time, or it may terminate the Plan altogether at some point"[17]).

Moreover, the 1998 and 2004 SPDs deferred to the collective bargaining agreements by

---

[17] The reservation of rights clause in Bender went on to provide: "Amendments to the Plan could result in changes in the benefit eligibility rules under the Plan, and in the benefit provisions under the Plan. A termination of the Plan could mean that all benefit payments immediately cease, or that benefit payments would be discontinued at some future date." Id. at *10.

indicating that they did not modify or constitute any provision of the agreements, nor alter or affect rights under such agreements. (Docket No. 67-6 at2). Although, under <u>Maurer</u>, a union is "obligated to grieve or enter suit" if it disagrees with an employer's assertion in an SPD that it can curtail or limit coverage, <u>id</u>. 212 F.3d at 913, this obligation is limited "to 'unqualified reservation-of-rights language' . . . that 'claims a 'unilateral right by the employer to terminate coverage without regard to existing or future collective bargaining agreement.'" <u>Prater v. Ohio Educ. Ass'n</u>, 505 F.3d 437, 444 (6th Cir. 2007) (quoting, <u>McCoy</u>, 390 F.3d at 424-25). The reservation of rights language here, is "not sufficiently unqualified so as to fairly be expected to prompt an immediate protest by the union." <u>Bender</u>, ___ F.3d at ___, 2012 WL 1537916 at *9.

Finally, Pulaski and the Plan argue they are entitled to summary judgment because Plaintiffs have failed to demonstrate what benefits are due. It points out that Pulaski retirees "received a subset of the benefits to which Pulaski's active employees were entitled," and argues that "[w]here, as here, labor agreements provided union retirees with health benefits commensurate with those provided to current employee, retiree health benefits change as do those of active employees and terminate when benefits for active employees." (Docket No. 92 at 13-14).

In support of this argument – which effectively is that because the terminated employees receive no continuing healthcare benefits, the retirees must suffer the same fate – Pulaski and the Plan rely exclusively on <u>Reese v. CNH America LLC</u>, 574 F.3d 315 (6th Cir. 2009). Such reliance is misplaced.

In <u>Reese</u>, the district court held that plaintiffs were "entitled to vested lifetime retiree health care benefits . . as provided for in the labor agreements in effect at the time of their or their decease spouses' retirement." <u>Id</u>. at 327. On appeal, the Sixth Circuit found it necessary to "modify the

district court's judgment," and, in doing so, wrote:

> .  .  .   To the extent this ruling indicates that the retirees have a vested right to receive health care benefits for life, it is consistent with <u>Yolton</u> and our other cases. But to the extent it suggests that these benefits must be maintained precisely at the level provided for in the 1998 CBA, it is not supported by the 1998 CBA, extrinsic evidence provided by the parties or common sense.  CNH, in short, cannot terminate all health-care benefits for retirees, but it may reasonably alter them.  With this guidance, we leave it to the district court to decide how and in what circumstances CNH may alter such benefits – and to decide whether it is a matter amenable to judgment as a matter of law or not.

<u>Id</u>.

In this case, the Court finds that the class members have a vested right to receive health care benefits for life.  In accordance with the teaching of <u>Reese</u>, the Court will consider the evidence presented at trial to determine whether, and to what extent, Defendants may be allowed to alter the retiree health benefits which were provided at the time of the closure of the Pulaski facility.[18]

**B.  Claims Against RCA**

Plaintiffs seek to hold RCA liable based on piercing the corporate veil, alter ego and/or successor liability theories.  Each of those theories require a focused inquiry into the relationship between Pulaski and RCA, yet noticeably absent from this Court's recitation of the facts is any extended discussion about that relationship, and with good reason.

In support of their Motion for Summary Judgment, Plaintiffs set forth some 72 paragraphs of what they characterize as undisputed material facts, the majority of which deal with RCA and its relationship to Pulaski.  In response, RCA admits to only 16 of those facts and, with respect to the remainder, either objects or (in most cases) characterizes the statements as "disputed as misleading and inaccurate."  For their part, Plaintiffs dispute far fewer of the facts presented in Defendants' 130

---

[18] This case is scheduled to be tried to the bench.

paragraph recitation of the facts, but, critically they dispute facts about whether RCA did, in fact, maintain a separate identity from Pulaski, both before and after the closure of the Pulaski facility.

Having considered the filings made by the parties, the Court finds that it is not in a position to determine whether, in fact, RCA should be held liable for continued health benefits under the theories presented by the Plaintiffs. That is a determination that the Court will make after trial.

## IV. <u>CONCLUSION</u>

Based upon the foregoing, Plaintiffs' Motion for Summary Judgment will be granted insofar as they seek to establish their entitlement to receive retiree healthcare benefits, but denied insofar as they seek to hold RCA liable for those benefits. The Motions for Summary Judgment filed by Defendants (Docket Nos. 70 & 72) will be denied, except to the extent that Plaintiff alleges a breach of fiduciary duty claim against Pulaski. The Court will schedule a bench trial to determine whether RCA is liable for Plaintiffs' retiree healthcare benefits, and, if so, the extent of that liability.

An appropriate Order will be entered.

Kevin H. Sharp
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE