# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### COLUMBIA DIVISION

| | | |
|---|---|---|
| EDWARD L. CHEATHAM, LARRY GIST, | ) | |
| WILLIAM HOLT, AND JAMES TEEPLES, | ) | |
| ON BEHALF OF THEMSELVES AND ALL | ) | |
| OTHER PERSONS SIMILARLY SITUATED, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **No. 1:11-00006** |
| | ) | **Judge Sharp** |
| THE R.C.A. RUBBER COMPANY OF | ) | |
| AMERICA, THE PULASKI RUBBER | ) | |
| COMPANY, AND THE PULASKI RUBBER | ) | |
| COMPANY BENEFIT PLAN, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

This is a class action to recover health benefits brought by Plaintiffs Edward L. Cheatham, Larry Gist, William Holt, and James Teeples on behalf of themselves and other union retirees or former union employees (and their spouses) of the Pulaski Rubber Company ("Pulaski"). By previously entered Order and Memorandum (Docket Nos. 102 & 103), the Court found Plaintiffs are entitled to receive retiree health care benefits under the Pulaski Group Insurance Agreement as amended over the years, but that questions of fact existed as to whether Defendant R.C.A. Rubber Company of America ("RCA") is liable for those benefits. Cheatham v. R.C.A. Rubber Co. of Am., 2012 WL 1745524 (M.D. Tenn. May 16, 2012). Accordingly, the Court held a bench trial on that remaining issue on February 20, 2013, after which the parties filed extensive proposed findings and conclusions, responses, and replies, the last of which was received on May 29, 2013.

Having considered the parties' proposed findings and conclusions, their arguments, the

Case 1:11-cv-00006   Document 176   Filed 07/22/13   Page 1 of 33 PageID #: 5800

voluminous written evidentiary record (including stipulations, deposition testimony, and exhibits), and the testimony of the only witness who testified at trial, the Court hereby enters the following Findings of Fact and Conclusions of Law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

## I.  FINDINGS OF FACT

### A.  Background and Relationship of the Parties

1.  The class in this case consists of retirees (and their dependent spouses) who worked at Pulaski and were members of the bargaining unit represented by the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC, or predecessor unions (collectively, the "union").  Each of the named Plaintiffs retired by 2001, several years before Pulaski ceased operations. Additionally,  Plaintiff Gist was President of Local 641 of  United Rubber Workers (the "URW") for three years in the 1970s or 1980s.

2. RCA was incorporated as an Ohio corporation on December 18, 1931, and has its principal place of business in Akron, Ohio. It presently has approximately 75 employees.

3.  Throughout its existence, RCA has been largely family-owned.  Since at least 1970, the majority of RCA shares have been owned by members of the Reiss family, who are related to the late C. E. Reiss, Sr., one of the founders of RCA.  In 2004, 90% of RCA was owned by R. T. Reiss, his sister, and their children, C. E. Reiss II and Sherry Price.

4.  RCA manufactured, and continues to manufacture, rubber flooring for the transit industry, including stair and step treads.  These treads are generally colored and custom manufactured. RCA's products also include or included rubber commercial flooring for hospitals, school buildings,

and gymnasiums.  Although a rubber manufacturing company, RCA does not manufacture tires.

5.  In the mid-1950s, Murray Ohio Manufacturing Company moved its operations from Cleveland, Ohio to Tennessee.  Pulaski was established to make bicycle tires for Murray.

6.  Pulaski was a wholly-owned subsidiary of RCA, incorporated in Tennessee on May 2, 1956.  From the date of incorporation until its closure on October 1, 2005, Pulaski had its principal place of business in Pulaski, Tennessee.

7.  For many years, Pulaski manufactured tires for both toys and farm implements.  In the late 1970s, however, Pulaski began to manufacture rubber products for the transit industry. Part of the reason for this transition was because, even though it was doing well financially and had a positive net worth in the 1980s of several million dollars, Pulaski found that it was not able to compete with offshore companies.  Additionally, toy tires, such as those used on tricycles, were increasingly being made out of plastic.  For at least the last five years of its existence, Pulaski made only transit-related products; primarily flooring for school buses and school bus step treads.

8.  RCA manufactured and sold to Pulaski the basic raw materials from which Pulaski fabricated most or all of its products.  Those materials were shipped from Akron to Pulaski in the form of large rolls of "calendered" rubber, that is, rubber processed into thin sheet for further manufacturing.  On occasion, RCA shipped Pulaski "uncalendered" rubber which Pulaski then calenderized to manufacture its products.

9.  When engaged in inter-company transactions, RCA and Pulaski invoiced the other for materials, products, equipment, and commissions. The companies also exchanged bills of lading, shipping notices, and receiving tickets to account for the inter-company transactions.

3

10.  While Pulaski was in the tire making business, it had its own sales force, separate from RCA.  However, when it switched to the rubber flooring and tread business, Pulaski did not employ a sales force.  Rather, RCA acted as the sales arm for which Pulaski paid RCA a commission to cover the marketing expenses.  Thus, RCA sold Pulaski's transit products along with its own and, at times, directed its customers to order from Pulaski, *e.g.*, if RCA had an order from a school bus manufacturer for black rubber flooring, RCA would instruct the manufacturer to enter an order with Pulaski for the step tread which would be sold to RCA, and combined in one shipment with the flooring manufactured by RCA.

11.  When either RCA or Pulaski could manufacturer an order, RCA would decide whether the order should be manufactured at RCA in Akron or at Pulaski, taking into account factors such as the customer's time frame, whether RCA or Pulaski had time available, and whether current production at one or the other facility could be interrupted to accommodate an expedited order.

12.  Many management functions for both RCA and Pulaski were performed at RCA's offices in Akron, including payroll, marketing, accounts payable, billing and operations management.  RCA billed Pulaski $6,000 per month for these administrative services, a figure that remained constant for at least 20 years.  Included in that figure was a portion of the salary of Pulaski's controller salary, and overhead covering the salaries of the data processing supervisor and the billing department.

13. In the mid-1980s, Kathy Tyler (an RCA employee and later RCA and Pulaski corporate Secretary) served as cashier for both RCA and Pulaski, cutting checks and doing banking.  During this same period, Pulaski's payroll accounts were set up to require RCA's approval of checks over $300.

14.  In 1996, Pulaski's Board of Directors authorized Pulaski to open a main account and a payroll account at the Pulaski National Bank, with RCA's Eugene Rue listed as controller and included among the individuals authorized to countersign checks drawn on the main account. Pulaski's Board also declined to grant Pulaski Plant Manager Gene Adams or Officer Manager Tommy Hodge independent check writing authority on Pulaski's payroll account; instead, hourly employees' paychecks were validated by designated RCA employees.  In 1999, Pulaski authorized Rue, who was now RCA's controller, to open accounts in Pulaski's name; endorse checks and withdraw funds for Pulaski; borrow money and execute promissory notes on behalf of Pulaski; and pledge security for sums borrowed on behalf of Pulaski.  In 2004, Pulaski's payroll was moved to a third-party vendor.

15.  From 1985 to the present, the corporate officers of RCA and Pulaski were as follows:

| RCA OFFICERS 1985-Present | Title and Period of Service | PULASKI OFFICERS 1985-Present | Title and Period of Service |
|---|---|---|---|
| Sherry D. Price | President & CEO (2007-present)<br>Secretary (1999-2003)<br>Treasurer (1999-present) | Sherry D. Price | President & CEO (2007-present)<br>Secretary (1996-2003)<br>Treasurer (1999-present) |
| Richard T. Reiss | President (thru 1998)<br>Treasurer (thru 1998) | Richard T. Reiss | President (thru 1998)<br>Treasurer (thru 1998) |
| Clifford E. Reiss | President (1999-2003)<br>Secretary (thru 1999)<br>Assistant to President (thru 1999) | Clifford E. Reiss | President (1999-2002)<br>Assistant Secretary (thru 1998)<br>Assistant to President (1996-1999) |
| Richard T. Reiss II | President & CEO (2004-2006)<br>Executive VP (1999-2003)<br>VP (1994-1998) | Richard T. Reiss II | President & CEO (2003-2006)<br>VP (1996-2002) |
| Dale Wilson | Assistant Secretary (1999-present) | Dale Wilson | Assistant Secretary (1999-present) |
| Shane R. Price | VP (2009-present) | Shane R. Price | VP (2009-present) |

5

| RCA OFFICERS 1985-Present | Title and Period of Service | PULASKI OFFICERS 1985-Present | Title and Period of Service |
|---|---|---|---|
| Kathy Tyler | Secretary (2004-present) | Kathy Tyler | Secretary (2004-present) |
| Richard Pinnard | VP of Flooring (1999-2000) | C. Blake McDowell | Secretary (1985-1995) |
| Eugene Rue | Controller (1999-2003) | | |
| Leonard Maher III | VP of Operations (1999-2003) | | |
| Eli E. Lines | VP Purchasing (thru 1993) | | |
| Gordon Schultz | VP of Transit Flooring (1999-2003) | | |
| | | | |

Thus, with the exception of C. Blake McDowell who served as Pulaski's Secretary prior to 1995 (while also a director of RCA), the principal corporate officers have been identical for over two decades.

16. In light of the dual role of the officers (and in particular members of the Reiss family), the officers often signed and approved labor contracts for both RCA and Pulaski.

17. Further in regard to the relationship between RCA and Pulaski, the parties have stipulated the following:

• Until and for some period after Pulaski's closure on or about October 1, 2005, separate banking and operating accounts were maintained for RCA and Pulaski.

• Throughout their existences, RCA and Pulaski have had separate boards of directors.[1]

• RCA and Pulaski have maintained separate inventory and equipment.

---

[1] Shareholders' meetings for both Pulaski and RCA were held at RCA's office in Akron. For the most part (leaving aside pension plan amendments and banking related documents) the minutes of the shareholder's meetings were short and *pro forma*.

• Separate corporate documents were maintained for RCA and Pulaski.

• Separate books and records existed for RCA and Pulaski, including separate financial statements, journals, ledgers, profit and loss statements, income statements, and balance sheets.

• Pulaski and RCA had separate taxpayer/employer identification numbers.

• Through 2004, the respective financial statements of RCA and Pulaski were reviewed by independent certified accountants, and those reviews identified related-party transactions between and among the RCA and Pulaski, including inter-company sales, inter-company accounts receivable, and inter-company accounts payable.

• RCA filed consolidated income tax filings, identifying and accounting for its affiliates and subsidiaries, including Pulaski, from 1984 through 2009.

(Docket No. 129 at 15-16).

## B. Collective Bargaining and Welfare Benefit Agreements

18.    On September 26, 1960, the URW was certified as the collective bargaining representative for Pulaski's non-management employees.  The URW negotiated with Pulaski's General Manager John Norton and entered into a collective bargaining agreement ("CBA") in 1962. At that time and through 1995 when the URW merged into the USW, URW Local Union No. 641 represented the bargaining unit at Pulaski. Throughout this period, each of the CBAs provided that "[t]his Agreement [is entered into] by and between the Pulaski Rubber Company of Giles County, Tennessee, hereinafter referred to as the 'Company' and Local Union No. 641, United Rubber, Cork, Linoleum, and Plastic Workers of America[.]" (See, e.g., Def. Ex. at 0002). Further in each of the

7

CBAs, the URW acknowledged that "[t]he management of the business, the operation of the plant, and the authority to execute all the various duties, functions, and responsibilities incident thereto is vested in the Company" which was defined as Pulaski. (<u>Id</u>.).

19.  William Marvin Burkhardt ("Burkhardt") served as the Key Staff (or International) Representative for the URW until 1985, and from 1985 through 1990 served as the URW district director for the South and Southeastern United States. Mr. Burkhardt, on behalf of the URW and URW Local No. 641, negotiated CBAs, including extensions, with Pulaski and was the chief spokesperson on behalf of the union during negotiations.

20.  When Mr. Burkhardt began negotiations labor agreements with Pulaski in 1969, Pulaski's Vice President, John Norton, who lived in Pulaski, negotiated on behalf of Pulaski. Each of the agreements Burkhardt negotiated contained the language previously mentioned about the agreement being between Pulaski and the URW, and he negotiated with Pulaski, not RCA.

21.  In 1985 when Burkhardt felt the need to renegotiate the contract, he sent a letter to Gene Adams, Pulaski's Plant Manager evidencing his desire to terminate and renegotiate the CBA. Thereafter,  Burkhardt and local union representatives negotiated with Pulaski representatives a number of agreements, including a September 13, 1987, Memorandum of Contract between Pulaski and URW Local Union No. 641; a March 10, 1988, Memorandum of Contract between those parties; and a September 13, 1992, Memorandum of Contract between those parties. Leonard Maher III who served as RCA's Vice President of operations from 1999 to 2003 (and was never an employee, director or officer of Pulaski) was a signatory to these contracts and other such contracts.  However, RCA was not a party to any of these contracts, and Burkhardt does not recall any CBAs negotiated with Pulaski that referenced RCA.

8

22. After the URW merged into the USW in 1995, Burkhardt served at USW's Key Staff Representative until his retirement in 2002.  In that role, Burkhardt, on behalf of the USW and USW Local No. 641, negotiated CBAs,  including extensions, with Pulaski.   Like before, these agreements provided that they were entered into "by and between the Pulaski Rubber Company of Giles County, Tennessee, hereinafter referred to as the 'Company' and Local Union No. 641, United Steelworkers of America[.]" (See, e.g., Def. Ex 49 at 00131).  In each of the agreements, the union acknowledged that "[t]he management of the business, the operation of the plant, and the authority to execute all the various duties, functions, and responsibilities incident thereto is vested in the Company," which

is defined as Pulaski. (See, id.).  Like before, Maher was a signatory on some of the contracts, but RCA was not a party to the contracts.

23.  During the more than thirty year period between 1969 and 2002, Burkhardt, on behalf of the URW and USW, negotiated between twelve and fifteen collective bargaining agreements, including extensions, with Pulaski in Pulaski, Tennessee, but never negotiated a labor agreement with RCA. Regardless of who sat at the bargaining table on behalf of Pulaski, Mr. Burkhardt, as a representative for the URW and USW, understood that the agreement was being negotiated with Pulaski. Likewise, Gist, when president of the local, negotiated with Pulaski, and he never negotiated any labor agreement on behalf of a bargaining unit that negotiated with RCA.

24. Burkhardt's successor as Key Staff Representative for the USW, James Buckley, never negotiated any labor agreement with RCA, and he is unaware of any CBA covering Pulaski employees that had on it any name other than Pulaski Rubber Company.

25.  During CBA negotiations with the URW and USW, Pulaski disclosed certain of its

financial information (separate from that of RCA) in an effort to convince the union to ask for less from Pulaski.

26. Some of the CBAs were "me too" agreements, meaning that the company and the union adopted an agreement that was largely identical to another. Thus, for example, the parties sometimes utilized an agreement between the URW and RCA as a starting point for negotiating a contract between the URW and Pulaski which was then tailored for the specific circumstances at the plant. 27. RCA negotiated CBAs with a local union different from that with which Pulaski negotiated, and, even though there were similarities, the CBAs for RCA and Pulaski were not mirror images of one another.

28. In the 1970's, when R.C.A.'s unionized workforce struck for approximately eight weeks, Pulaski's unionized workforce did not honor the strike, but rather continued working. Likewise in 2001 when RCA's unionized workforce struck, Pulaski's USW unionized workforce continued working and did not honor the strike.

29. In addition to the CBAs covering non-management employees, RCA and Pulaski sponsored separate self-funded welfare plans, some of which provided health care benefits to active employees and retirees. In this regard, Pulaski sponsored and funded the Pulaski Rubber Company Benefit Plan (the "Plan") from its inception, including the Pulaski Group Insurance Agreement ("Insurance Agreement"), which was negotiated between Pulaski and the USW. These agreements were negotiated simultaneously with, but separately from, the CBAs and remained in effect between 1985 and the 2005 shutdown. For its part, RCA sponsored the RCA Rubber Company Life Insurance and Medical Benefits Plan, a welfare benefit plan providing health benefits to RCA employees, which was negotiated between RCA and the USW and predecessor unions. Separate

10

Annual Returns/Reports of Employee Benefit Plans were filed for both the Pulaski and the RCA Plan, and Pulaski was listed as the Plan Sponsor and Plan Administrator for its plan.

30.  In 1985, Pulaski and the URW entered into a group insurance agreement which included retiree (and surviving spouse) health provisions and had an expiration date of September 13, 1987. That agreement acknowledges that it is "entered into this 15th day of September 1985 by and between Local 641 of the URW and "The Pulaski Rubber Company of Pulaski, Tennessee, hereinafter referred to as the Company[.]" (Def. Ex. 116 at 01660).

31.  In 1987, Pulaski and the URW entered into another group insurance agreement, effective September 13, 1987 to September 10, 1989.  In 1989, the union and Pulaski entered into a "First Amendment to the Pulaski Group Insurance Agreement" ("First Amendment"), in which they: (1) agreed that the 1987 Insurance Agreement expired on its own terms on September 10, 1989; (2) defined the 1987 Insurance Agreement as the insurance document to be renewed and continued with certain changes; and (3) provided that "[i]n all other respects, the [1987 Insurance] Agreement is adopted and incorporated in this First Amendment without change." Thereafter, in successive Amendments Two through Six to the 1987 Insurance Agreement, the parties continued to reference the 1987 Insurance Agreement (including the provision that it was between the URW and Pulaski); agreed to renew the terms of the 1987 Insurance Agreement, as previously amended and with any changes stated in the Amendments; agreed to a new effective date (recited in each successive amendment); and agreed to an end date.  Each of the Amendments Two through Six concluded with identical language stating: "in all other respects, the amended Agreement [i.e., the 1987 Insurance Agreement, as modified by all subsequent prior amendments] is adopted and incorporated into this [current Amendment] without change."  Maher was a signatory to the Third, Fourth, Fifth, and Sixth

11

Amendment.

32. As the Plan Sponsor and Plan Administrator, Pulaski was "responsible for the day-to-day functions and administration of the plan." (See, e.g., Def. Ex. 104 at 35). However, and in accordance with the provisions of the Plan, RCA was designated as the Plan Supervisor.

33. In its capacity as Plan Supervisor, RCA provided services to plan participants, including receiving, processing and paying claims. Plan participants who wanted to verify eligibility and benefits were instructed to call an RCA telephone number, and medical providers who needed to pre-certify a claim contacted RCA for approval.

34. In 2008, RCA entered into an Administrative Services Agreement ("ASA") with Aultra Administrative Group (Aultra), a third party administrator to administer benefits under both the RCA and Pulaski plans.

C. **Shutdown of the Pulaski Plant**

35. Although Pulaski's workforce did not honor the 2001 strike, that three to four month strike negatively impacted its business because Pulaski lacked access to the raw materials necessary to fulfill its contracts. RCA, too, lost business, including three of its best customers. Because Pulaski's customers were RCA's customers, Pulaski suffered significant future loses as a result of the strike.

36. After the strike, RCA continued to send raw materials to Pulaski despite Pulaski's inability to pay for them, with most of the deficit recorded on the books of Pulaski and RCA as a growing amount that Pulaski owed to RCA. The deficits were not evidenced by debt instruments and no interest was charged or paid.

37. Through 2000, Pulaski was self-sufficient and did not require investments from RCA

to pay its bills. However, Pulaski paid no dividends after 2001. In fact, during the period between 2000 and the 2005 plant closure, Pulaski lost as much as $100,000 per month, and went from having a net worth of $2,500,000 to a deficit of at least $2,000,000.[2]

38. During its decline, RCA advanced money to Pulaski so that Pulaski could continue operations, cover expenses, and pay its bills. RCA also continued to send raw materials to Pulaski despite the fact that Pulaski was unable to pay for them. The financing arrangements between RCA and Pulaski were not reflected in formal agreements, nor were they the result of any formal decision-making reflected in the board resolutions or minutes. By the time of its closure in 2005, Pulaski owed RCA at least $1,500,000 for raw materials, payroll, and fixed costs.[3]

39. Given the steady decline in business, RCA's leadership approached officials in Tennessee and Ohio to discuss whether it would be advantageous to consolidate operations in either Pulaski or Akron. Officials in Tennessee offered various incentives and in May 2004, RCA's controller Allan Larris informed the board that there would be few advantages to consolidating manufacturing operations in Akron and that if they were consolidated in Tennessee, the saving would be approximately $1.2 million annually. Nevertheless, RCA ultimately determined to maintain its manufacturing facility in Akron. Declaring bankruptcy for Pulaski was not considered

---

[2] For the fiscal year ending June 30, 1999, Pulaski's net sales totaled $12,472,401, but for the fiscal year ending June 30, 2005 net sales had dropped to $7,474,996. During that same period, profits disappeared. For fiscal year 1999, Pulaski's net profits totaled $319,231; for fiscal year 2005, Pulaski had losses of $1,626,766.

RCA's sales also declined dramatically in the last decade. For the fiscal year ending June 30, 2000, RCA's net sales totaled $23,587,082, but for the fiscal year ending June 30, 2010, RCA's net sales totaled $9,721,961.

[3] Although Pulaski had a line of credit with a bank, the line was secured by RCA's accounts receivables and general intangibles, rather than Pulaski's own assets.

13

as an option.

40. In the summer of 2005, Pulaski and the USW negotiated a Plant Closure and Termination Agreement. That agreement recited that Pulaski and the USW were "parties to a Collective Bargaining Agreement and a Group Insurance Agreement each effective September 2, 2002 through September 10, 2006." The parties did not negotiate for a continuation of the retiree health benefits. In his deposition, Buckley, who negotiated the Closure Agreement on behalf of the USW, explained that he was informed by Ken Millisor, a Pulaski representative, that the company did not have to negotiate any coverage for retirees.

41. The USW sent a letter dated August 29, 2005, notifying Pulaski of its acceptance of the Closure Agreement. By executing the Agreement, the USW consented to all its provisions, including "that upon the release of the last bargaining unit employee which will signify the permanent cessation of the manufacturing operations at the Pulaski, Tennessee facility, this Plant Closure and Termination Agreement shall be the sole agreement between the Parties and the collective bargaining relationship, the Collective Bargaining Agreement and the Group Insurance Agreement shall then terminate." (Def. Ex. 3 at 7).

42. RCA was not a party to the Closure Agreement. However, Leanne Wagner, an RCA employee who worked in various capacities, executed the Agreement of behalf of Pulaski, as did Richard T. Reiss II, the President and Chief Executive Officer of both RCA and Pulaski.

43. The Closure Agreement provided expedited lump sum pension benefits to all employees who were terminated under its terms. At the time, the Pulaski Company Pension Trust Plan was underfunded and, as a part of the Closure Agreement, the USW negotiated a merger of the R.C.A. Company Pension Trust Plan and the Pulaski Pension Plan in order to provide those severance

14

benefits. Both RCA and its local union, as well Pulaski and its local union approved the merger of the pension plans, thereby allowing the payment to active Pulaski employees.

44. On October 1, 2005, Pulaski was closed pursuant to the Closure Agreement. At the time of the shutdown, RCA covered Pulaski's bills and held all of Pulaski's debt. Any production of school bus flooring then in the works was shifted to Akron, where RCA continued to produce school bus treads.

45. After the plant was closed, Pulaski sold its equipment. Much of the manufacturing equipment was sold at auction with the proceeds deposited in RCA's account and credited against Pulaski's debt to RCA. Equipment that could be utilized by RCA was shipped to Akron, with RCA crediting the transferred equipment, at its depreciated book value, against Pulaski's debt to RCA.

46. Pulaski continued to own the Pulaski facility until it was sold in January 2009 for $350,000, consisting of an $85,000 down payment and a mortgage and note held by Pulaski for the $265,000.00 balance.[4] Pursuant to the note, the buyer is obligated to make monthly payments of $2,810.73. Checks from the buyer are made payable to Pulaski, and deposited into RCA's bank account. RCA accounts for payments on the note by an entry to reduce RCA receivables from Pulaski and by an entry to reduce payables owed by Pulaski to RCA.

47. On June 30, 2006, RCA's books reflected accounts receivable from Pulaski of $2,120,578.60, which was the cumulative result of cash transfers from RCA to Pulaski. The last bank account for Pulaski was closed in 2007.

48. After the shutdown, Pulaski did not maintain its registration as an active corporation with the Tennessee Department of State, but was reactivated in order to consummate the sale. It is

_____

[4] The facility was purchased by Parr Industries which is unrelated to either RCA or Pulaski.

15

now defunct, but exists as a corporate entity in order to reduce tax liability on the income from the sale of its facility.

### D. Continuation Of Health Benefits After Shutdown

49. After the closure in 2005, RCA continued to pay Pulaski's retiree health insurance benefits for the next five years. RCA also paid for services required to keep the Plan going, such as the costs associated with recordkeeping, insurance fees, and commissions to agents and brokers.

50. As noted, RCA entered into an ASA with Aultra in 2008 which then separately administered benefits under the Pulaski and RCA welfare plans. Pursuant to the ASA (to which Pulaski was not a party), Aultra prepared billings for the RCA and Pulaski plan participants and submitted those billings to RCA. RCA paid the billings for Pulaski on checks drawn from RCA's bank account.

51. In January 2007, Dale Wilson, Esq. advised Rick Reiss II, then-president of both Pulaski and RCA, of his opinion that, under the 2005 Closure Agreement, there was no legal obligation to pay for Pulaski retiree health benefits, and he drafted a letter to notify the Pulaski retirees and their dependents of the discontinuation of medical insurance benefits. The letter was never sent.[5]

52. By January 2009, RCA had fallen almost $1,000,000 behind in payments to Medical Mutual of Ohio, the sponsor of the healthcare network that provided benefits under the Pulaski and RCA plans administered by Aultra. In an effort to address the arrearage, RCA represented that it anticipated receiving funds from a real estate deal (presumably the Pulaski facility), the proceeds

---

[5] Approximately one month after the letter was drafted, Reiss' contract was not renewed by RCA's board. Sherry Price was subsequently installed as President of RCA.

16

of which would be used to pay medical claims.

53. Effective September 1, 2010, RCA issued "The R.C.A. Rubber Company Health Benefits Plan – Pulaski," and "The Pulaski Rubber Company Employee Benefit Plan – Medicare Retirees." Those plan documents indicate that the named fiduciary and plan administrator is RCA, and that while a third party administrator had been hired to manage the day-to-day operations of the Plan, RCA had the sole authority to amend the plan and determine its policies and make final decisions on all claims to benefits. Those plan documents also state that the "employer pasy for all costs related to the Plan solely out of its general assets."

54. In 2010, Sherry Price, and her son Shane Price, contacted Wilson about unpaid Pulaski retiree medical charges, at which point Wilson informed them of his belief that there was no legal obligation to provide for retiree health benefits.[6] Wilson drafted a letter dated August 16, 2010, informing the retirees that their health benefits would be discontinued as of November 1, 2010. The letter was sent on RCA stationary, and RCA claims this was due to the fact that Pulaski stationary no longer existed.

55. After November 1, 2010, some Pulaski retirees continued to be covered under the plan as a result of COBRA, which provided for coverage for 18 months upon election. Because COBRA coverage has expired, no Pulaski retirees are currently covered.

56. The cost to RCA for providing benefits to Pulaski retirees and their dependents after the shutdown was between $100,000 and $200,000 per year.

## II. CONCLUSIONS OF LAW

---

[6] Sherry price testified in her deposition that she did not know that the retiree health benefits were still being paid until she was informed in 2010 of a renal patient who had significant outstanding bills. Plaintiffs assert that Ms. Price must have know that the payments were still being made. The Court is in no position to assess Ms. Price's credibility on this issue as she was not called as a witness at trial.

This action is brought under Sections 502(a)(1)(B) and (a)(3) of the Employee Retirement Income Security Act ("ERISA") of 1974, 29 U.S.C. § 1132(a)(1)(B) and (a)(3), and Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 1985(a), based upon RCA's failure to provide benefits allegedly owed under the CBAs and insurance agreements. As noted at the outset, this Court has already ruled that Plaintiffs are entitled to receive retiree health benefits, with the question now being whether RCA is liable for those benefits.

Plaintiffs seeks to hold RCA liable under three alternative theories: (1) RCA's corporate veil should be pierced; (2) RCA is a successor to Pulaski for purposes of Pulaski's retiree health care obligations; or (3) RCA is a fiduciary for the Pulaski plan and breached its fiduciary duty to Plaintiffs by terminating their benefits in violation of the Plan. Having fully considered the matter, the Court finds that RCA's corporate veil should be pierced and that Plaintiffs are entitled to an appropriate remedy for RCA's refusal to pay benefits after November 1, 2010.

## A. Piercing the Corporate Veil

"It is a general principle of corporate law deeply 'ingrained in our economic and legal systems that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries,'" United States v. Bestfoods, 524 U.S. 51, 61 (1998) (citation omitted), and, thus, "[a] corporation is presumed to be a separate entity from its shareholders." Michigan Capenters Counsel Health and Welfare Fund v. C.J. Rogers, Inc., 933 F.2d 376, 385 (6th Cir. 1991). "But there is an equally fundamental principle of corporate law, applicable to the parent-subsidiary relationship as well as generally, that the corporate veil may be pierced and the shareholder held liable for the corporation's conduct when, inter alia, the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud, on

the shareholder's behalf." Bestfoods, 524 U.S. at 61.

In actions brought under ERISA, "a federal standard for piercing the corporate veil" applies "because the underlying ERISA claim is a federal law claim." Corrigan v. United States Steel Corp., 478 F.3d 718, 723 (6th Cir. 2007); see, Hamilton v. Carell, 243 F.3d 992, 1004 (6th Cir. 2001) (citation omitted) ("'Courts have without difficulty disregarded corporate form for substance where ERISA's effectiveness would otherwise be undermined"). The same holds true for claims brought under the LMRA. See, Pace Ind. Union-Mgmt Pension Fund v. Dannex Mfg. Co., 394 Fed. App'x 188, 198 (6th Cir. 2010) (citation omitted) ("Whether a company or individual is responsible for the financial obligations of another company or individual is a question of federal law when it arises in the context of a federal labor dispute."). Further, because "recognition of corporate form can be related to federal policies, . . . deference to the corporate identity may be particularly inappropriate in relation to ERISA because Congress enacted ERISA in part to protect employees who were being deprived of anticipatory benefits because of a corporate sham." Laborers' Pension Trust Fund v. Sidney Wineberger Homes, Inc., 872 F.2d 702, 705 (6th Cir. 1988).

The Sixth Circuit has "held that the corporate veil may be pierced if the court finds 'substantial reasons for doing so' after considering three general factors: (1) 'the amount of respect given to the separate identity of the corporation by its shareholders" (2) 'the degree of injustice visited on the litigants by recognition of the corporate entity,' and (3) 'the fraudulent intent of the incorporators.'" Int'l Union, United Auto., Aerospace and Agr. Implement Workers of Am. v. Aguirre, 410 F.3d 297, 302 (6th Cir. 2005) (quoting, C.J. Rogers, Inc., 933 F.2d at 384 (6th Cir. 1991)). "'In analyzing these three general factors, courts frequently consider more specific factors such as "undercapitalization of the corporation, the maintenance of separate books, the separation

of corporate and individual finances, the use of the corporation to support fraud or illegality, the honoring of corporate formalities, and whether the corporation is merely a sham.'" Id. at 302-03 (citation omitted). None of the three general factors is dispositive, as a court is required to weigh them in determining whether there is a substantial reason for disregarding corporate status. C.J. Rogers, 933 F.2d at 384.

Plaintiffs have presented substantial reasons for piercing RCA's corporate veil under the facts presented. However, prior to setting forth the factors which lead this Court to that conclusion, it is necessary to briefly address the Supreme Court's decision in United States v. Bestfoods, 524 U.S. 51 (1998) because RCA faults Plaintiffs for failing to address that decision, and suggests that the case significantly changed the analysis utilized to determine whether a corporate veil under federal common law.

RCA cites Bestfoods for the proposition that "courts may pierce the corporate veil only where, unlike here, the corporate form is being used to accomplish certain wrongful purposes, most notably fraud," (Docket No. 165 at 12, quoting Bestfoods, 524 U.S. at 62), and then argues that "[i]n light of the 'glaring shortfall' in Plaintiffs' evidence regarding any fraudulent purpose of R.C.A., no basis exists for piercing the corporate veil between R.C.A. and Pulaski." (Id., citation omitted). Contrary to RCA's suggestion, Bestfoods does not hold that fraud is a prerequisite to piercing the corporate veil, as even the language quoted by RCA states that fraud is but a notable form of a wrongful purpose for which the corporate form might be used.

Pre-Bestfoods, the Sixth Circuit specifically indicated that a showing of fraud is not an indispensable requirement for piercing the corporate veil under federal law, and that "if both injustice and little respect for the corporate entity are shown" it is not "necessary to show fraud,"

20

and that "[w]here extraordinary injustice is shown, it alone may be sufficient to predicate liability." N.L.R.B. v. Fullerton Transfer & Storage, Ltd., 910 F.2d 331, 341 (6th Cir. 1990). This Court does not read Bestfoods as changing that law, particularly since, post-Bestfoods, the Sixth Circuit has reiterated that courts are to consider the three general factors (among them fraudulent intent), Aguirre, 410 F.3d at 302, an exercise which would be unnecessary in cases where there is no showing of fraud. The conclusion is bolstered by the fact that several circuit courts in the post-Bestfoods era have stated that fraud is not a necessary prerequisite to veil piercing under federal law. See, Tr. of Nat'l Elevator Indus. Pension v. Lutyk, 332 F.3d 188, 194 (3rd Cir. 2003) (under federal common law, the Third Circuit uses several factors, but has "never characterized these 'factors' as elements of a rigid test" and the "test does not require proof of actual fraud as a prerequisite for piercing the corporate veil"); Williamson v. Recovery Ltd. Partnership, 542 F.3d 43, 53 (2nd Cir. 2008) (citation omitted) (in determining whether to pierce a corporate veil under federal law, "the general principle guiding courts . . . 'has been that liability is imposed when doing so would achieve an equitable result,'" and, therefore, controlling corporation must have used the subsidiary "'to perpetrate a fraud *or* have so dominated and disregarded [the corporate entity's] corporate form that [the corporate entity] primarily transacted [the individual]'s personal business rather than its own corporate business.'").

RCA also claims that, in Bestfoods, "the Supreme Court . . . held that the duplication of some or all of the directors or executive officers does not support piercing the corporate veil." (Docket No. 165 at 6). Again, this is an overstatement of Bestfoods' holding because what the Supreme Court actually stated was that a duplication of officers and/or directors is not "fatal" to a claim that a parent corporation observed corporate formalities in relation to its subsidiary. Bestfoods, 524 U.S.

21

at 68.  This was made clear when the Supreme Court stated  that "'it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, *and that fact alone* may not serve to expose the parent corporation to liability for its subsidiary's acts.'"  Id. at 69 (citation omitted, italics added).  At best on this issue, Bestfoods stands for the proposition that where there exists a duplication of directors, there is a presumption  "that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary," id. (citation omitted). Bestfoods  certainly did not entirely remove from consideration in the veil piercing analysis whether the parent and subsidiary share officers and directors.

4urning to the applicable factors, RCA argues that its corporate veil should not be pierced because "R.C.A. and Pulaski negotiated separate CBAs with separate USW and URW locals for more than forty years, maintained separate books and records, had separate boards of directors, had separate tax identification numbers, recorded inter-company liabilities and transactions, maintained separate health plans, filed separate Form 550s, had separate workforces, had separate locations, maintained separate bank accounts (until Pulaski ceased operations), and made separate filings to government agencies."  (Docket No. 165 at 3-3).   RCA then argues that "Plaintiffs fail to recognize that the formalities honored by Pulaski and R.C.A. were those recognized in [Aguirre]" and assert that "R.C.A. and Pulaski honored formalities in excess of those in Aguirre."  (Id.).

There is evidentiary support for each of the foregoing facts identified by RCA, and RCA musters cases which support its contention that the existence of such facts counsel against piercing the corporate veil.  However, the decision whether to pierce a corporate veil and thereby ignore the protection afforded by corporate status depends upon the totality of the circumstances.  See, Chao v. OSHA, 401 F.3d 355, 365 (5th Cir. 2005);   United States v. Funds Held in the Name of Wetterer,

210 F.3d 96, 107 (2nd Cir. 2000). The Court finds, based upon the totality of circumstances, RCA's corporate veil should be pierced for purposes of the Pulaski retirees' health benefits.

RCA and Pulaski were, at least on paper, separate legal entities, but in reality RCA completely controlled and dominated Pulaski and that control and domination ultimately worked an injustice on the Pulaski retirees. Numerous factors lead to this conclusion.

While there is a presumption that officers wear different hats depending on whether they are acting for the parent company or the subsidiary, Bestfoods, 524 U.S. at 68, and while having common officers and directors "is a common business practice that exists in most parent and subsidiary relationships," Judson Atkinson Candies, Inc. v. Lantini-Hohberger Dhimantec, 529 F.3d 371, 381 (7th Cir. 2008), it is telling in this case that, with only one exception, the principal corporate officers for both RCA and Pulaski were identical during the last thirty years of Pulaski's existence. See, Id. (citation omitted) (fact of common ownership or common officers may show "the opportunity to create a unity of interest").

It is also telling that the corporate records maintained by Pulaski were largely *pro forma* consisting (with the exception of documents reflecting bank matters and pension plan amendments) almost entirely of short unanimous written consents. Compare, Aguirre, 410 F.3d at 303 (refusing to pierce corporate veil where, among other things, evidence showed that company "kept thorough minutes"). Even when Pulaski faced dire financial straits, the minutes and corporate records reflect no independent or meaningful evaluation or analysis of Pulaski's situation, its dependence on RCA, or the possibility that the plant might need to be shut down. Pulaski's corporate records also, apparently, do not reflect any meetings, resolutions, or minutes about the decision to terminate the retirees' health benefits.

Through the common officers, RCA had input into, and a firm grasp over, all of Pulaski's business dealings and finances. For example, the Board authorized Pulaski to open a main account and a payroll account at the Pulaski National Bank, but included RCA's Rue as among those individuals authorized to countersign checks drawn on the account. Rue was also given the authority to open accounts in Pulaski's name, withdraw funds for Pulaski, borrow money on its behalf and pledge collateral to secure Pulaski's loans. At the same time, neither Pulaski's Plant Manager or Office Manager had independent check writing authority for Pulaski's bank account and an RCA employee was required to validate all of its payroll checks. RCA officers also signed off on CBAs and insurance agreements, even though RCA was not a party to those agreements.

Additionally, RCA personnel in Akron exercised significant, and sometimes total control and/or oversight, over various aspects of Pulaski's operations, without which Pulaski could not function. Most obvious in this regard were the banking, payroll, accounting and billing operations undertaken by RCA. While Pulaski was billed $6,000 monthly for these services, that figure remained constant for more than twenty years, and RCA has not shown that the amount billed came close to covering the cost of services rendered. Compare, Aguirre, 410 F.3d at 303 (plaintiff failed to show lack of respect for corporate identity where "company followed standard formalities," including that "it had an accounting department headed by a chief financial officer, as well as non-shareholder officers and staff who managed day-to-day corporate operations"); Schussler-Womack v. Chicasaw Tech. Prod. Inc., 116 Fed. Appx. 950, 954 (10th Cir. 2004) (parent company not liable for alleged ERISA violation where, among other things, evidence showed that it "maintained separate payrolls" and "accounting systems"). Further, while inter-company transfers were noted on the books, those books were maintained by RCA employees in Akron.

24

RCA was also responsible for supplying Pulaski with raw materials, including calendarized and uncalendarized rubber, without which Pulaski could not operate as evidenced by Pulaski's serious financial downturn following the strike in Akron. When Pulaski exited the tire business and for a long time before it was closed, it relied on RCA in Akron for marketing and sales, and RCA's customers were Pulaski's customers.

Pulaski's utter reliance on, and control by, RCA is further borne out by what happened as Pulaski's profits disappeared. RCA acted as Pulaski's bank during the last years of Pulaski's existence, funneling huge sums of money into Pulaski, and supplying it with raw materials, regardless of whether Pulaski could pay for those materials. The transactions were ostensibly loans, yet there were no formal arrangements made for repayment, Pulaski was not charged interest, and there is no indication that the practice was approved by any formal decision-making process or by Board resolution by either RCA or Pulaski.

Regardless of how the transactions were characterized, it is clear that, without RCA's help, Pulaski could not survive. It was effectively insolvent. This is important, even if Pulaski was not undercapitalized as that term is generally understood,[7] because serious insolvency during the final

---

[7] Plaintiffs argue that Pulaski was undercapitalized because, from late 2001 onward, Pulaski simply could not operate without RCA's infusion of cash. In support of their position that this constitutes undercapitalization for purposes of piercing the corporate veil, Plaintiffs cite Bucyrus-Erie Co. v. Gen'l Prod. Corp., 643 F2d 413, 418 (6th Cir. 1981) wherein the Sixth Circuit, in passing, found "no error" with an instruction that the jury could "consider whether the corporation was adequately financed, originally or subsequently, for the business in which it was engaged." However, "'failure of a business venture and resulting loss of capital does not constitute gross under-capitalization as that term is used [to pierce the corporate veil].'" Southeast Texas Inns, Inc. v. Prime Hospitality Corp., 462 F.3d 666, 680 (6th Cir. 2006) (citation omitted, brackets in original). Instead, the focus is generally on whether the company was undercapitalized when it was formed, and "[t]he fact that a corporation is losing money does not show that it is undercapitalized." Judson Atkinson, 529 F.3d at 379. In any event, "undercapitalization is merely one factor to be considered, and is not a requirement for piercing the corporate veil." Pharmacia Corp. v. Motor Carrier Services Corp., 309 Fed. App'x. 666, 672 (3rd Cir. 2009).

years of operations is an appropriate matter to consider in determining whether to pierce the corporate veil. See, Lutyk, 332 F.3d at 198.

When Pulaski went out of business – a decision made by RCA apparently in complete disregard of the savings which might have occurred were the operations consolidated in Tennessee – the equipment that was not shipped to RCA at depreciated value was sold at auction with the proceeds placed in RCA's account. Likewise when the manufacturing facility was sold, the proceeds were deposited into RCA's bank account and credited against the large debt which had been amassed, just as the monthly payment on the note went into RCA's account.

The Pulaski facility has been used to RCA's advantage in other ways as well. Before it was sold, RCA informed Mutual Medical of Ohio that the proceeds from an anticipated sale would be used to pay down the amount owed on RCA's own welfare plan. After the facility was actually sold, RCA reduced its tax liability by offsetting the gains from the sale of the facility against the losses Pulaski accumulated. Such things suggest dealing in favor of RCA at the expense of other creditors which would include the Pulaski retirees.

The fact that RCA and Pulaski had separate labor agreements for more than forty years does not, in this Court's view, militate against a finding that RCA was Pulaski's alter ego. While RCA was not a party to Pulaski's agreements, some were negotiated by RCA officers and many were signed by RCA's officers.

More importantly, RCA continued health benefits for the Pulaski employees for five years after the plant was shuttered, and shouldered all of the expenses necessary to support the plan during this period. Given the amount of money involved and the fact that Pulaski was self-insured, the Court does not view this as a mere oversight or a magnanimous gesture on RCA's part, but rather

26

a recognition that RCA was legally obligated to pay the benefits.  See, Wimer v. Kurz-Kasch, Inc., 773 F.2d 669, 686 n. 6 (6th Cir. 1985) ("if it were necessary, in determining the intent of the parties, to rely on facts *dehors* the contracts, the fact that retirees' insurance benefits initially were continued after the collective bargaining agreements expired and the stated reason they were discontinued would be some evidence of the parties' intent.").  As one court observed in the context of a case where the parent company continued to fund the hospital and medical benefits obligations of its wholly owned insolvent subsidiary, "[i]t is difficult to explain such sizable expenditures by a non-eleemosynary, stockholder-owned institution without there being a sense of legal obligation to make those expenditures."  United Steelworkers of Am., AFL-CIO v. Connors Steel Co., 855 F.2d 1499, 1504 (11th Cir. 1988) (quoting district court's unpublished decision and affirming judgment); see, Peters v. N.L.R.B.,  153 F.3d 289, 297 (6th Cir. 1998) (a successor can be bound by an agreement  where it is the alter ego of the predecessor, or voluntarily assumes the obligations of the agreement).

The acknowledgment of RCA's obligation to provide benefits is also shown by the fact that, after Pulaski closed, RCA sent various forms of correspondence to the Pulaski retirees on RCA letterhead referencing coverage under the RCA Rubber Company Healthcare Plan.  Moreover, the Pulaski plan was revised and restated effective May 1, 2010, and in those revised plan documents RCA was identified as the "Named Fiduciary, Designated Legal Agent and Plan Administrator." Further, the  costs of the plan were to be paid out of the employer's general assets, which could only mean RCA since Pulaski was by then defunct.   Given these documents, a Pulaski retiree could reasonably expect that RCA and Pulaski were interchangeable for purposes of their receipt of health benefits, a point which is only underscored by the fact that, even before that change in plan language

(but after the plant closed), retirees continued to receive benefits ostensibly from "Pulaski," yet Pulaski was nothing more than a corporate shell with no assets.

Under the circumstances of this case, the Court finds that substantial injustice would be visited on the Pulaski retirees were the Court to continue to recognize RCA as a distinct corporate entity. Obviously, if the Court does not pierce RCA's corporate veil, the retirees will not receive health benefits because Pulaski is defunct and any assets that it may have had have effectively been co-opted by RCA. See, Lumpkin v. Environdyne Indus., Inc., 933 F.2d 449, 461 (7th Cir. 1991) ("The underlying congressional policy behind ERISA clearly favors the disregard of the corporate entity in cases where employees are denied their pension benefits."); Alman v. Danin, 801 F.2d 1, 4 (1st Cir. 1986) ("Allowing [the parent] of a marginal [undercapitalized subsidiary] to invoke the corporate shield in circumstances where it is inequitable for them to do so and thereby avoid financial obligations to employee benefits plans, would seem to be precisely the type of conduct Congress wanted to prevent."); Central Ill. Carpenters Health & Welfare Trust Fund v. Struben, 2009 WL 497393 at *19 (C.D. Ill. Feb. 24, 2009) ("To honor the corporate separation would, under these circumstances, perpetrate one of the injustices that ERISA was designed to eliminate, namely the endangering of workplace benefits by employer misconduct"). The injustice is amplified in this case because the Pulaski retirees received healthcare benefits for years after Pulaski closed, only to have them removed when the upper echelon at RCA became aware of a large sum paid for a renal patient, and then supposedly discovered that none of the Pulaski retirees should have received health benefits after the plant closed in the first place.

## B. **Remedy**

Having determined that RCA is liable and effectively stands in the shoes of Pulaski, the

28

Court's task is to determine an appropriate remedy. "ERISA § 502(a)(1)(B) allows a plan 'participant or beneficiary' to bring a civil action to "recover benefits due to him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.'" Tackett v. M & G Polymers, USA, LLC, 561 F.3d 478, 490 (6th Cir. 2009) (quoting, 29 U.S.C. § 1132). In Tackett, the Sixth Circuit stated that the retirees' request "for recovery of health benefits due under the plan (including monetary damages), a declaration of their rights to health benefits under the plan, and an injunction prohibiting the plan administrator from modifying or terminating retiree health benefits in the future" were remedies "cognizable under 502(a)(1)(B)." Id. at 492. Additionally, Section 502(a)(3) of ERISA allows a participant or beneficiary to bring suit "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3). This section "is a 'catchall' for ERISA violations . . . that allows courts to provide 'appropriate' equitable relief ," but it "is not an appropriate means to relief when a plaintiff merely 'repackage[s]' a § 502(a)(1)(B) claim." Id. (quoting, Varity Corp. v. Howe, 516 U.S. 489, 511 (1996)).

Plaintiffs are entitled to an injunction that requires RCA to pay claims submitted to and approved by the Plan. See, Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 143 (1985) (under Section 501(a)(1)(B), participant is allowed "to recover accrued benefits, to obtain a declaratory judgment that she is entitled to benefits under the provisions of the plan contract, and to enjoin the plan administrator from improperly refusing to pay benefits in the future"). Beyond that, the Court is in no position at this time to determine the extent to which the Plaintiffs are entitled to further

29

relief.

In this case, Plaintiffs request various and alternative types of damages. Specifically, in the

Pretrial Order, Plaintiffs state:

> Plaintiffs ask the Court to award Class Representatives and Class members such benefits, pursuant to the terms of the applicable collective bargaining agreements and the Plan, and/or monetary damages (plus interest), as necessary to restore them to the position in which they would have been but for Defendants' contractual and statutory violations.

> More specifically, Class Representatives and class members who continued coverage under COBRA seek restitution and damages in order to reimburse them for the premiums which they have had to pay to continue their medical coverage, plus any additional out-of-pocket costs class members may have incurred as a result of Defendants' actions. Named Plaintiffs and other class members who dropped coverage under the Plan seek reimbursement for the costs of securing alternative coverage and/or any out-of-pocket costs they may have incurred as a result of Defendants' actions. All class members also seek interest on these amounts.

> As the Plan sponsor(s) and fiduciary(ies) responsible for administration of the Plan and payment of Named Plaintiffs' and class members' benefits and the damages flowing from the breach of their fiduciary and contractual duty(ies), Pulaski and/or RCA are also responsible for determining the extent of Plaintiffs' damages. Plaintiffs envision that, as part of any remedy under either 502(a)(1)(B) or 502(a)(3) in this case, Defendants will be ordered to obtain information about damages from the Class members (subject to monitoring by Class counsel) and to pay them restitution and damages for any adverse financial consequences as a result of Defendants' breach.

> Plaintiffs also reserve the right to claim, in the alternative, the value of the premiums stated by the Company in order to continue healthcare coverage under COBRA as means of compensating the class members for their lost benefits. As an additional alternative measurement of damages, Plaintiffs have previously disclosed all available information they have collected about the amount of damages suffered by the members of the putative class through August 2012. Due to age and, in some cases, infirmity of the class members, Plaintiffs are unable to ascertain the precise amount of all such damages. Plaintiffs' efforts in this regard are continuing.

(Docket No. 126 at 5-6).

While Plaintiffs may have envisioned that the Court would order Defendants to obtain

information about damages, what the Court envisioned was that, at trial, Plaintiffs would call

30

witnesses and provide at least some evidentiary support for their claimed damages, just as the Court envisioned that witnesses would be called at the February 20, 2013, trial after it was decided that the question of RCA's liability could not be determined based solely upon the summary judgment papers.

All the Court has before it in regard to individual damages is a spreadsheet titled "Summary of Certain Class Members' Medical Costs After November 1, 2010" (Pfs. Ex. 35) which purports to show how much was spent on monthly premiums and medical bills by certain Pulaski retirees and/or members of their families. There is no indication as to whether this is somehow typical of how much was spent by the retirees generally, or even the percentage of retirees covered by the spreadsheet. More importantly, the Court is not in a position to determine the spreadsheet's accuracy, as there is no indication as to how it was prepared and by whom, and it has not been authenticated or shown to be admissible.

In their proposed findings, Plaintiffs state that "as an alternative remedial measure, the Court could . . . order Defendants to pay Retirees the value of the benefits as determined by reference to the cost of the monthly COBRA premium – $388.09 for an individual and $788.86 for a family – from November 1, 2010, through the date of judgment[.]" (Docket No. 164 at 45). Where those figures come from, the Court does not know, nor does the Court know how many of the Pulaski retirees may have opted for COBRA benefits, or whether such a figure would serve as a windfall to those who chose not to elect continuing COBRA coverage.

The Court is fully aware that determining damages in a class action is not a precise science, however there must be some evidentiary basis for the award which is fair to both plaintiffs and defendants. Further complicating matters, after this Court granted Plaintiffs' unopposed Motion

31

for Class Certification and certified a class action under Fed. R. Civ. P. 23(b)(2), <u>Wal-Mart Stores, Inc. v. Dukes</u>, 131 S.Ct. 2541, 2557 & 2258 (2011) was decided. There, the Supreme Court stated that "[t]he key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted,'" and "it [is] clear that individualized monetary claims belong in Rule 23(b)(3)."

All of the foregoing is to say that, based upon the record before it, the Court finds that RCA is liable for benefits going forward, but the Court is not in a position to determine what the class members may be entitled to in the form of equitable damages for the loss of health benefits due under the plan. The parties are strongly encouraged to enter into good faith negotiations to resolve this issue.[8] In the absence of an agreement, the Court will hold a hearing to discuss how this matter should now be handled, fully recognizing that one possibility is that the class may need to be converted to a 23(b)(2) class and a trial held in regard to the retirees' equitable damages, but that there are other possibilities as well. <u>See</u>, <u>Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.</u>, ___ F.3d ___, ___, 2013 WL 3389496 at * 6 (10th Cir. June 9, 2013) ("there are ways to preseve the class action model in the face of individualized damages" and "the district court is in the best position to evaluate the practical difficulties which inhere in the class action format, and is especially suited to tailor the proceedings accordingly"); <u>Epenschied v. DirectSat USA, LLC</u>, 705 F.3d 770, 775 (7th Cir. 2013) ("once liability is established damages claims can usually be settled with the aid of a special master, and trials thus avoided"); <u>Beattie v. CenturyTel, Inc.</u>, 511 F.3d 554, 562 (6th Cir. 2007) (citation omitted) (" '[t]here are a number of management tools available to a district court to address any individualized damages issues,' such as 'bifurcating liability and damage trials,' or 'appointing a magistrate judge or special master to preside over individual

---

[8] This encouragement also applies to settling the entire case.

damages proceedings'").

### III. <u>CONCLUSION</u>

Based upon the foregoing, the Court finds that Plaintiffs, on behalf of themselves and other union retirees or former union employees (and their spouses) are entitled to receive retiree health care benefits under the Pulaski Group Insurance Agreement as amended over the years, and that RCA is liable for those benefits. The Court further finds that Plaintiffs are entitled to an injunction that requires RCA to pay claims submitted to and approved by the Plan. The Court defers ruling on the equitable damages to which Plaintiffs may be entitled and will set that issue for a hearing.

An appropriate Order will be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE